STATE OF MISSOURI, *ex rel.* ATTORNEY GENERAL, *v.* ST. LOUIS, KANSAS CITY & NORTHERN RAILWAY COMPANY.

December 14, 1876.

1. Under an act approved March 18, 1871, entitled "An act authorizing the formation of union depots and stations for railroads in cities of this State," *held*, that by the proclamation of the policy of the State therein — that all railroads entering a city should find a terminus at one common center — the State gave, by the strongest and most necessary implication, the means to the accomplishment of that end.

2. One Jessup purchased, under a deed of trust, the road and franchises of the North Missouri Railroad Company; respondent filed articles of association and became a body corporate, and purchased the North Missouri railroad and franchises from Jessup. Among these franchises was the right to construct lateral or branch roads to any point. Respondent acquired the right from the city of St. Louis to pass from west to east through the city to the Union Depot, and proceeded to construct a branch road from Ferguson's Station, on the line of said road, to the Union Depot in said city. *Held,* that it had the right to do this, and, the policy of the State having been declared by the act of March 18, 1871, she could not object on the ground that respondent was usurping powers not granted by the State.

QUO WARRANTO proceeding.

*Demurrer to return overruled.*

H. A. *Clover,* R. G. *Frost,* and M. *Kinealy,* with *John A. Hockaday,* Attorney General, for relator, cited : Pennsylvania R. R. Co. *v.* Canal Comrs., 21 Pa. St. 22 ; Attorney General *v.* West Wisconsin Ry. Co., 36 Wis. 466 ; The People *v.* Albany & Vermont R. R. Co., 19 How. Pr. 523 ; 37 Barb. 216 ; 24 N. Y. 261 ; Brigham *v.* Agric. Br. R. R. Co., 1 Allen, 316 ; 1 Redf. on Rys., last ed., 410, part 4, pl. 11, note 15 ; Pierce on Rys. 218 ; Act of March 3, 1851, sec. 7 ; Morris & Essex R. R. Co. *v.* Central R. R. Co., 31 N. J. L. 208, 209 ; Works *v.* Junction R. R. Co., 5 McLean, 425 ; Little Miami R. R. Co. *v.* Nayler, 2 Ohio St. 235 ; Blakemore *v.* Glam. Canal N. Co., 1 Myl. & K. 162 ; *s. c.,* 1 Cl. & Fin. 262 ; Moorehead *v.* Little Miami R. R. Co., 17 Ohio, 347 ; Hudson & D. C. Co. *v.* New York & Erie R. R. Co., 9 Paige, 323 ; The State *v.* Norwalk & D. T. Co., 10 Conn. 157 ; Newhall *v.* Galena & Chicago R. R. Co., 14 Ill. 273 ; Hoyle *v.* Plattsburg & M. R. R. Co., 51 Barb. 64 ; Vilas *v.* Milwaukee & Prairie DuChien Ry. Co., 17 Wis. 503 ; Delaware D. C. Co. *v.* The Commonwealth, 50 Pa. St. 407 ; Metz *v.* Buffalo, Corby & P. R. R. Co., 58 N. Y. 65 ; Mayor, etc., *v.* Norwich & W. R. R. Co., 109 Mass. 114 ; Miller *v.* R. &. W. R. R. Co., 36 Vt. 493 ; Eldridge *v.* Smith, 34 Vt. 485 ; Phillip *v.* Winslow *et al.,* 18 B. Mon. 446 ; Atkinson *v.* The Marietta & C. R. R. Co.,

15 Ohio St. 36; Wag. Stat. 315, sec. 57, p. 200, sec. 6; Black *v.* Delaware, etc., Canal Co., 22 N. J. Eq. 130; Wood *v.* B. & B. R. R. Co., 8 Phila. Rep. 94; Campbell *v.* M. & C. R. R. Co., 23 Ohio.

*James O. Broadhead* and *Wells H. Blodgett*, for respondent, cited: Gen. Stat., sec. 2, ch. 63; Sess. Acts 1871, p. 59; Sess. Acts 1870, p. 454, sec. 1; Sess. Acts 1864, sec. 14; Sess. Acts 1869, p. 73; Vandal *v.* Dock Co., 40 Cal. 88; The Commonwealth *v.* Cross Cut R. R. Co., 53 Penn. 69; C. & P. R. R. Co. *v.* Speer, 56 Pa. St. 331; Hall *v.* Sullivan, 21 Law Rep. 138; Pierce on Rys. 520; Redf. on Rys. 621; 1 Dill. 325, 326; Wag. Stat. 328, sec. 8, p. 289, sec. 1, p. 309, sec. 32.

*James O. Broadhead*, for respondent, cited: Wag. Stat. 298, sec. 2, p. 304, sec. 14, p. 296, sec. 1; Daniel *v.* St. Louis, Kansas City & Northern Ry. Co., 62 Mo. 43; Sly *v.* Pennsylvania R. R. Co., 65 Pa. St. 209; Campbell *v.* Marietta & Cincinnati R. R. Co., 23 Ohio St. 188; The State *ex rel. v.* Green County, 54 Mo. 540; Seymour *v.* Canandaigua & Niagara Falls R. R. Co., 25 Barb. 308; Willink *v.* Morris Canal and Banking Co., 3 Green, 402; Pierce *v.* Emory, 32 N. H. 485, 507; The People *v.* Hillsdale Turnpike Co., 2 John. 190; The State *v.* Evans, 3 Ark. 585; The Commonwealth *v.* Delaware & Hudson Canal Co., 43 Pa. St. 295; Dill. on Mun. Corp. 325; Tomlinson *v.* Branch, 15 Wall. 464; Atkinson *et al. v.* M. & C. R. R. Co., 15 Ohio St. 36.

GANTT, P. J., delivered the opinion of the court.

This is an information in the nature of a *quo warranto* instituted by the attorney general in the name of the State, calling on the respondent to show by what warrant it claims to have and enjoy certain liberties, franchises, and privileges which it exercises in St. Louis County.

The information sets forth the act of March 3, 1851, incorporating the North Missouri Railroad Company; an act amendatory of the first, approved January 7, 1853, which

permitted the company (sec. 9) to continue its road from
St. Charles to any point in the city of St. Louis, and for
that purpose to have and hold a strip of land 100 feet wide;
that in pursuance of these acts the company constructed its
road from Brotherton Station, on the south bank of the
Missouri River, to the intersection of Second and North
Market Streets, in St. Louis, passing through certain enu-
merated stations; that during the year ending December
31, 1875, more than 37,000 trips were made on said road
from St. Louis to College View, Woodland, Jennings' Sta-
tion, and Bellefontaine; that in 1869 the North Missouri
Railroad Company issued its bonds for $4,000,000, secured
by a deed of trust to Solon Humphreys and others; that
under this deed a sale was made, and one Jessup, acting for
himself and others, secretly organized to acquire the road,
purchased it from the trustees and received their deed; that
he and his associates thereupon took possession of the road,
extended it to Biddle Street, St. Louis, and on January 2,
1872, filed articles of association in the office of the secre-
tary of state, setting forth the names of the associates, the
name of the corporation — which was its present designation
— its term of existence, its capital stock, the length of its
constructed line, and that it proposed to construct two miles
of road in St. Louis County, between Plum Street and North
Market Street, *and such other tracks as might be needed
for connection with the bridge, then building,* etc., and also
about ten miles of road in the counties of Clay, Jackson,
etc. The articles named the directors for the year, and pro-
vided for the election of their successors, and declared their
purpose to organize under chapter 63 of the General Stat-
utes of Missouri. The information went on to say that
Jessup conveyed to this corporation the property by him
purchased as aforesaid; that this corporation had no power
except, etc.; that it took possession of and operated the
road; that the Atlantic & Pacific Railroad Company, a cor-
poration, etc., has extended said road from Biddle Street to

Poplar Street, along the Levee, and thence on Poplar to the track of the St. Louis Railway & Tunnel Company, which goes to the bridge and connects with the track thereon; that thereby respondent has fully carried out the intent of its charter; that on August 25, 1871, certain persons, therein named, filed in the office of the secretary of state articles of association purporting to incorporate the St. Louis County Railroad, to run from St. Louis to a point on Creve Cœur Lake; that afterwards, on June 19, 1872, this last-named company passed a resolution extending its line from its eastern terminus to a point near Seventh Street; that after August 25, 1871, these persons, thus associated, claimed to be a corporation; that they proceeded to locate and construct their road between Union Avenue, in St. Louis Township, and Academy Lane, in Central Township, and a branch from Union Avenue to the junction of Olive Street and Bonhomme Road, and caused some grading to be done on said portions of said road, but no part of it was completed prior to the contract presently to be mentioned; that by an act of the General Assembly, approved March 25, 1872, to establish Forest Park, a public park was created with defined limits, with the reservation of the right of the St. Louis County Railroad to a track of seventy feet wide through the park; under this act the St. Louis County Railroad Company claimed a right of way through the park; that up to that time no line or track had been designated; that up to this time the respondent's line of road was continuous from St. Charles to North Market Street, without branch or deviation, and that no part of it came within three miles of the line of road of the St. Louis County Railroad Company, and the last-named company had in fact abandoned its design of making the proposed road; that on August 11, 1875, respondent made a contract in writing with the St. Louis County Railroad Company, reciting that the latter, being a railroad corporation of Missouri, had acquired the right of way over certain enumerated tracts of land, and that re-

spondent, being also a Missouri railroad corporation, was desirous of reaching the Union Depot in the city of St. Louis, and to acquire the right of way thereto, and to compose all controversies with the St. Louis County Railroad Company; and thereupon it was stipulated that the respondent, for certain considerations, should have the right of way over the land of the St. Louis County Railroad Company. On the same day a contract was made by respondent with the commissioners of Forest Park and the St. Louis County Railroad Company, by which the commissioners granted to the St. Louis County Railroad Company the right of way over a piece of land forty-two feet wide, traversing the park. This land was shown by a plat. The rest of the contract is irrelevant. That, after the making of this contract, respondent proceeded to construct a road from Ferguson's Station to the intersection of Olive Street and Bonhomme Road, and thence along the line of the St. Louis County Railroad Company to Fourteenth Street, in St. Louis; that it is purchasing lands along that route with the intention of diverting to it its main line of travel for freight and passengers, and to make Fourteenth Street its principal terminus, without lawful authority; that it had no power to make said contracts or to construct the new road, or to run its cars to any terminus except that of North Market or Biddle Street. And thereon the attorney general prayed judgment.

The return of the respondent admitted everything stated in the information relating to the acquisition by it of the North Missouri Railroad; denied or ignored the several allegations imputing bad faith to those who had conveyed to it; admitted the organization of the St. Louis, Kansas City & Northern Railway Company, but denied the limitations on its powers stated in the information; denied that it and the Atlantic & Pacific Railroad Company have extended any line of road along the Levee to Poplar Street and thence to the bridge; denied that it had any interest in any road on the Levee south of Carr Street, or on Poplar Street, or con-

necting with the bridge; admitted that the corporators of the St. Louis County Railroad Company did file articles of association on August 25, 1871; averred that thereafter it was a duly organized railroad corporation; admitted the subsequent extension of the road to Seventh Street; also the passage of the act establishing Forest Park; averred that the track of the St. Louis County Railroad Company was laid out through the park according to its terms; denied that no part of this road was within three miles of respondent's road; ignored the condition of the St. Louis County Railroad Company and the work done on its road; averred that its own line of road was, on the day of its contract with the St. Louis County Railroad Company, continuous and connected with that of the other company; that the latter company had not then abandoned its projected road. And the return of respondent then admitted the contracts of itself with the Forest Park commissioners and the St. Louis County Railroad Company, and denied the falsehood or fraud of the recitals contained therein.

For further return the respondent went on to state in detail the acts of 1851 and 1853, incorporating the North Missouri Railroad Company; to assert that all the franchises, etc., of this company passed by the sale to Jessup, and from him to it; that among these franchises was the right to construct lateral or branch railroads to any point; that to reach the bridge it was necessary to get into the tunnel; that this can only be done through the Union Depot, and that the only ingress into this is from the west; that on July 6, 1875, defendant obtained from the city of St. Louis permission to pass through the streets from the westward to the Union Depot; that it thereupon located and constructed a road from Ferguson's Station to the Union Depot, along the permitted line; that in August, 1875, it made its contracts with the St. Louis County Railroad Company and the commissioners of Forest Park; that on October 18, 1875, it obtained permission from the St. Louis County

Court to pass over certain intervening highways in St. Louis County, and that it thus became clothed with all power and authority to open, locate, construct, and operate its road from Ferguson's Station to the Union Depot.

To this return a general demurrer is filed. Though it may be well doubted whether this is sufficient, and whether some specifications of the causes of demurrer should not be given (Wag. Stat. 1015; Gen. Stat., sec. 7, ch. 165; *The State* ex rel. v. *Steers*, 44 Mo. 223), we proceed to examine the questions presented by the record.

Every material averment of the information imputing misconduct to the respondent is either denied or ignored, and then follows a statement of the matters relied on as a warrant for what is being done.

A complaint is made in the name of the State that the respondent, without warrant of law, is engaged in doing what it can only do by express legal sanction; that it is guilty of usurping a right not given to it by the State; that it pretends, under color of constructing a branch road from Ferguson's Station to the Union Depot, to virtually make a new terminus at that point, abandoning its old terminus at North Market Street or Biddle Street; that the respondent had no power to make the contracts of August, 1875, and can derive no advantage from them; and that all which it designs, and has accomplished, in connection with the route from Ferguson's Station to Union Depot is in violation of law, without warrant, and a usurpation which it is the duty of courts of justice to arrest.

The respondent justifies the claim and exercise of the franchise it enjoys by reference (1) to the charter of the North Missouri Railroad Company, all of whose franchises, etc., it claims to have appropriated through Jessup, by the sale under the mortgage or deed of trust; (2) to its articles of association; (3) to its contract with the St. Louis County Railroad Company and the commissioners of Forest Park.

In considering the questions discussed by counsel, we will leave out of view all title derived from the St. Louis County Railroad Company or the commissioners of Forest Park. There is no question before us of a trespass committed by the respondent. The State complains that the respondent has been guilty of usurpation by constructing and operating a road from Ferguson's Station to Union Depot. This usurpation would not be qualified by showing that every land-owner over whose land the road runs had given his consent to it. It cannot be contended that the Forest Park commissioners can amend the charter or enlarge the powers of the respondent. The question before us is simply whether, under the circumstances shown by the record, the respondent had a right to construct and operate the road in question, complying, of course, with all legal prerequisites to the exercise of such a right.

It is declared in the return, and admitted by the demurrer, that the principal aim of the respondent, in constructing that road, was, and is, to reach the bridge over the Mississippi River at this point, and that access to the bridge can only be had through the Union Depot. If the right of the respondent to reach the Union Depot can be asserted, the demurrer must be overruled.

The Union Depot at St. Louis was formed under the provisions of an act approved March 18, 1871, entitled "An act authorizing the formation of union depots and stations for railroads in cities of this State."

The 1st section declared that, "in order to facilitate the public convenience and safety in the transmission of goods and passengers, in large cities, from one railroad to another, and to prevent the unnecessary expense, inconvenience, and loss attending the accumulation of a number of stations," any number of persons, not less than five, or any three or more railroads, might form a corporation, etc.

By section 2 it was provided that to any articles of association presented under this act, to the Circuit Court, should

be appended a certificate of at least three railroad companies having tracks into the city of the proposed depot, " stating its public utility and that they expect " to use it when constructed.

It would be a mockery if the General Assembly invited a railroad corporation to promote the formation of a union depot on the pledge that it expected to use it, and then withhold from such corporation the means of so using it. The respondent, in 1872 and since, would have been competent to make the required certificate in respect of the Union Depot at St. Louis.   The State invited it to do this.   Whether it actually so certified is unimportant.   It remains true that the State considered such a certificate essential in order to raise the presumption that the construction of such a depot would subserve the public convenience.   When such a depot was constructed, the legal presumption would be that it did promote this convenience; and the declared policy of the State was that all the railroads entering the city should find a terminus there.   It followed, of necessity, that any railroad having a terminus at a different point in the city should be permitted to change that terminus and make it at the Union Depot.   The alternative to this conclusion would be that the State, making provision for the public convenience, intended that its legislation for the promotion of that convenience should be liable to be crippled by formalities; and that, while in plain terms its policy was declared to be to cause all the railroads running into any large city to meet at a common center, it intended, nevertheless, to obstruct, by every technical objection, the accomplishment of this beneficent design.   We think this alternative wholly inadmissible.   We are of opinion that, in indicating the end to be gained, the State gave, by the strongest and most necessary implication, the means to that end; and that by the proclamation of its policy and purpose in the authoritative manner effected by the act of March 18, 1871, all obstacles

to its accomplishment were, so far as the State could effect it, cleared away.

We then find the respondent, in the year 1875, seeking to comply with the policy and wish of the State, declared in its statutes, by connecting its road with the Union Depot at St. Louis. From the nature of the case there could be but one such depot. The policy of the law forbade the multiplication of such centers. Such multiplication would be inconsistent with the leading idea of such institutions, if not a contradiction in terms. Wherever this Union Depot may be in St. Louis (and the return does not in precise terms point out its site), we are safe in assuming that to it any particular railroad, and the respondent among the rest, is invited and permitted to go. The question of getting there remains. The statute authorizing any road to reach the spot does not permit it to commit a trespass, or otherwise violate the law, in attaining its object.

So far as the respondent is concerned, we perceive in the nature of the space intervening between its terminus at North Market Street or Biddle Street (it is indifferent which of these be considered) obstacles of a serious character to a direct communication with the depot. The streets and houses of a populous city lie in the way; and the consent of the city authorities is by the organic law an indispensable condition to the opening of a railroad between these two points. Indeed, it is plain that, as the Union Depot lies within the city, no connection with it can be effected, since the adoption of that organic law, which is not approved by the city authorities. All this was, of course, known to the General Assembly in March, 1871. It follows that in declaring its policy, and desiring the establishment of railroad centers in its largest city, it proposed that this policy should be carried out in subordination to the obstacles existing to its direct execution; that, these obstacles being insuperable by the Legislature, some other mode of carrying out the policy

of the State, not conflicting with these obstacles, should be found and followed; that the several railroads running into St. Louis should have, as far as the State could confer it, the means of arriving at the Union Depot, leaving to the several roads the task of obviating, as best they might, the difficulties which the municipal authorities might throw in their way.

It is, we think, irrelevant whether the line adopted be, in an engineering sense, the best possible route by which, consistently with the permission of the city authorities, the cars of respondent can reach the Union Depot at St. Louis.   The problem is how to reach that depot.   We have the expression of the legislative will that all the railroads coming to St. Louis, and respondent's among the rest, shall have the power and legal authority to reach it by some route not inconsistent with law; and we are called on to say whether the means actually employed are warranted or unwarranted. We could not listen to detailed criticisms of the route actually used, if any such were offered; but such is not the scope of relator's objection.   It broadly contends that respondent has no power to construct or operate any route to the depot which does not pass through the Biddle Street terminus. This is alleged to be an indispensable condition.

So rigid is the line of argument urged by the relator on this head that it will not permit a communication made from a point one square north of the existing terminus, no matter how direct such communication might be or how short the distance between the point at which it diverged from the old line and the terminus at Biddle Street.   We are mistaken if the statement of this position does not suffice to show that it is not tenable.

It is technical in a high degree.   It requires, as vital, that the track by which the depot is reached shall pass through Biddle Street Station, even though that station should become, through a change of circumstances, or has already become, a point which no consideration of public con-

venience requires the road to continue to traverse or arrive at. It is easy to see, however, that, if there be something mystic in this point, and that it must at all events be traversed, this condition might be fulfilled by constructing a curve a few feet south of Biddle Street Station, and a track parallel to, and to the west of, the existing line, and on the strip of 100 feet wide which the North Missouri Railroad Company was authorized to hold in St. Louis County, until the necessary point of divergence was reached. In fact, by substituting a turn-table for a curve, or backing the cars (which are supposed to have complied with the imperative injunction to go to Biddle Street Station) on the same line to the point of divergence, the condition which, for the sake of the argument, we have supposed to be necessary will have been observed. But the enforcement of such empty, useless, and preposterous formalities would assuredly bring derision on all concerned. A court which would decree such things could hardly escape censure for disregarding that fundamental maxim of jurisprudence that the law never commands the performance of an idle ceremony. *Lex neminem cogit ad vana.* We are satisfied that it will not be enough to condemn a particular mode of reaching the Union Depot that the cars destined for that depot, and for no other, have not been carried hither and thither for no other purpose but to have touched Biddle Street in their passage.

As little do we think that it would be of the least consequence to halt these cars at the point of divergence until those — if any such there be — which are destined for Biddle Street Station have been sent thither, and the engine returned to the point of divergence to take them to the Union Depot. We wholly fail to see why the train may not, on reaching the point of divergence, be divided into two parts, and each sent on to its appropriate destination.

We have been led to this conclusion, in great measure, by the very significant language of the statute authorizing the formation of union depots. It may be a question,

which we desire for the present to leave untouched, whether, in giving to the different railroads ending in St. Louis a new terminus in order to concentrate their point of arrival, the old terminus is not, as a consequence, required to be abandoned or surrendered. The putting of an end to the evil of many different *termini* appears to be a cherished object of State policy. An equivalent, and more than an equivalent for a separate terminus, is offered. It may be plausibly contended that no one railroad can continue to have both of these. But we merely note the point in order to exclude the conclusion that it has escaped our notice. We do not mean to express an opinion on it.

We are of opinion that, under the sale to Jesup and his conveyance to the respondent, all the franchises, etc., of the North Missouri Railroad Company, including its power to build branch roads from the main line to other places or points, passed to the respondent. *Daniels* v. *St. Louis, Kansas City & Northern Ry. Co.*, 62 Mo. 43. This power is given in very large and general terms: "And the said company may also construct lateral or branch railroads to any point." Amended Chart., sec. 9, *ad finem;* Acts 1853, p. 326.

The counsel for relator have cited several cases, and especially *Works* v. *Junction R. R. Co.*, 5 McLean, 425 *et seq.*, to show that no such branch can be constructed as this from Ferguson's Station to Union Depot, under this grant of power. We are of opinion that this case and others cited by relator fall short of establishing the negative proposition, and that we have the authority of a court of eminent learning and ability for holding the affirmative of it.

The length to which our remarks have gone induces us to confine the remainder of this opinion to the discussion of these two cases.

In the case in 5 McLean, the charter of the respondent authorized it to construct a railroad from a point to be se-

lected on the Cleveland, Columbus & Cincinnati Railroad, within thirty miles of Cleveland, in either Cayuhoga or Lorain County, to Elyria ( unless that should be selected as the initial point), thence, on the most feasible route, to Bellevue on the Mad River & Lake Erie Railroad, or such other point on said road as the directors might choose, thence to Lower Sandusky, with power to construct the railroad, or a branch of it, from Elyria to Sandusky, and thence to Lower Sandusky.   This statement is not full, for we learn in the course of the opinion that Fremont, in Sandusky County, was the western terminus of the road fixed by the original charter.

By an amendment the company was authorized to extend its line to some point on the Maumee River, to cross that stream by ferry, or otherwise, and convey its passengers and freight to Toledo.

Under this charter the track was laid from Cleveland, *via* Ohio City and Elyria, to Sandusky City, and an attempt was made to construct it from that point, in nearly a straight line, to Port Clinton, across Sandusky Bay, reaching Maumee River by the shortest route.   Fremont was entirely neglected.   No road was built thither, and it was avowed that there was no intention to build any.   The reason assigned was that the people of that town did not subscribe with sufficient liberality towards the construction of the road.

The original charter gave the company power to construct branch roads from the main line to " other towns or places in the several counties through which it might pass."

By reference to the map of Ohio it will be seen that Cayuhoga, Lorain, Erie, and Sandusky, are the northernmost counties of the State, extending in the order named from Cleveland, in Cayuhoga County, westward, and bounded north by Lake Erie.   Sandusky County, however, only touches the lake at Sandusky Bay, which extends southward fully fifteen miles, perhaps more, from the general shore.

Ottawa County lies immediately north of Sandusky County, and is bounded north by the lake shore.   Fremont is almost the center of Sandusky County.   Port Clinton is in Ottawa County, on Lake Erie, to the north-east of Fremont, and fully twenty-five miles distant, judging from the map.

The road ran, as above stated, through Elyria, in Lorain County, thence north-westerly to the lake shore, thence skirting that shore to Sandusky City, in Erie County. Then, without going to Fremont at all, as already shown, it was constructed across the mouth of Sandusky Bay to Port Clinton, in Ottawa County, a point not authorized in the charter or amendment.   The company claimed the right to build this road under the " branching power."   The court held that this power was in terms only an authority to build a branch from one point to another in the same county, and this in any of the several counties through which the road might pass.   But Port Clinton, being in a different county from that in which Sandusky City was situated, was clearly not a point to which a branch could be constructed from the latter place (p. 432).   It may be seen at a glance that there were other and formidable objections to this road, and nothing is plainer than that it furnishes no argument against the branch from Ferguson's Station to the Union Depot.

In the case of *City of Pittsburg* v. *Pennsylvania Railroad Company*, 48 Penn. 355, decided in 1864, the question was whether the Pennsylvania Railroad Company had power to construct a road from Penn Street, in Pittsburg, across the Monongahela River, to a point in South Pittsburg.   It claimed to do so under this " branching power " in its charter, which permitted it " to make such lateral railroads or branches, leading from the main line of their said railroad, to such convenient places or points in any of the counties into which the main line, etc., might pass, or the directors and president might deem advantageous."

The court upheld the power.   " The cardinal object of

the company has been to make Pittsburg a great railroad center, within whose limits all the railroads approaching should connect with the Pennsylvania Railroad — a measure beneficial to the company, and most advantageous to all the inhabitants of our western metropolis. The connection is complete between the Pittsburg, Fort Wayne & Chicago Railroad and the main line, by a viaduct across the Alleghany, and it seems singular that there should be any objection to a similar connection between the Pittsburg & Steubenville Railroad, in South Pittsburg, and the Pennsylvania Railroad, by another viaduct across the Monongahela. * * * It is clear, therefore, that the company have power to build this branch; * * * transhipment of freight and passengers occasioning delay and expense and great dissatisfaction." *Per* Justice Read, delivering the unanimous opinion of the court, composed of Chief Justice Thompson and Associate Justices Agnew, Read, and Sharswood.

We quote but sparingly from this interesting opinion. It will be seen that, while the case at bar is so far like in circumstances to the Pennsylvania case, it is much stronger. In that, the leading policy of a principal railroad company was deemed sufficient to guide the decision of the court. Here we have the authentically-declared policy of the State of Missouri to control our action. Moreover, in that case a municipal corporation attempted to enjoin what it alleged was an unlawful and, to it, an injurious act. Here the State appears, asking the court to arrest, as an act of usurpation on the part of the respondent, an act to the performance of which the State has in the most unequivocal manner invited it.

The demurrer is overruled, all the judges concurring.